May it please the Court, my name is Kimberly Albraugh. I'm here on behalf of the appellant, Mr. Graham, and I'm going to discuss today whether Mr. Graham's motion to suppress evidence found during the warrantless search of his car should have been granted, and I will mainly focus on the justification found by the District Court, which was exigency. I think it's important to remember that there's a rule, and the rule is that warrantless searches are per se unreasonable. And while there are exceptions to that rule that are well documented in Supreme Court and circuit court law, the rule must still apply. And just because a car is movable doesn't give the police unfettered access to the car to search it without a warrant. The cases that are well outlined in our brief provide certain guidelines for when an exigency exists. And one of the circumstances where exigency exists is when there's a compelling law enforcement reason for searching the car without a warrant. The reason must be objectively reasonable such as a concern for the safety of the police or the public. But if there is a safety concern articulated, it must be a legitimate concern. And in addition to having all those reasons that must fit a warrantless search of a car, there's also a concern with whether it's feasible to obtain a warrant. And in this case, based on the facts, I don't believe there was an objectively reasonable or legitimate justification for this warrantless search. And that's because he was handcuffed and away from the car and the crowd was some distance away so there was no danger to the officer. Those are some of the facts, yes, sir, Your Honor. He was arrested and put in the back of a police car. He wasn't near the car. He certainly couldn't lunge toward it to get that weapon. Also, as you may recall from the testimony of the officers at the suppression drive, their first concern was with Mr. Graham who was parked in the road. While the officer is running a search on Mr., I guess a records check based on Mr. Graham's license, he's walking up to the yard checking with these two different groups of people. It took him six minutes total to talk to Mr. Graham initially, do a license check on him, talk to these two different groups of people, verify why the 911 call was made, and get back to focusing his attention on Mr. Graham. So out of all of that time, I would say it probably took two or three minutes but certainly less than a total of six minutes for the officer to talk to these people, one of whom made a 911 call and realized they weren't a danger at all, there was nothing unruly going on, there was no problem there, no criminal activity, and he was, I believe the officer testified, I refocused my attention on Mr. Graham. So there was no concern at all with these people and there was certainly nothing in the testimony, nothing in the record that showed anyone in the yard, anyone at this house ever approached Mr. Graham's car, approached him, came up and asked the officers whether there was a problem, what was going on, tried to go near the car, tried to go near the officers, nothing like that was shown in the record. So there's nothing to believe that this crowd was unruly or a danger to the police whatsoever. And furthermore, I believe some of the facts that are outside the actual danger or safety to the public and police that were not present is the fact that the police could secure the car. So this goes to whether or not it would be practicable for the police to secure a warrant to search the car once they found out a weapon was in it. When the officer drove up and Mr. Graham was parked in the street, he said Mr. Graham cranked up his car and was going to drive off but he told him to stop and the officer approached Mr. Graham and talked to him. Therefore, the car, the keys were left in the car ignition or they were on Mr. Graham when he was arrested and searched. So they certainly had the means to secure that car while they obtained a warrant. Furthermore, there was no one in the passenger seat, no one was with Mr. Graham and there's no evidence that anyone in the crowd knew Mr. Graham offered to take control of that car which was illegally parked in the street. So the officers were going to have to do something to secure that car, tow it, move it, get it out of the road because it certainly couldn't stay parked in the road obstructing traffic. So there were all sorts of mechanisms that the police would have to take to move that car and secure it. Therefore, there's no reason that it couldn't have been secured while the officers obtained a warrant. Furthermore, I think this case is a lot like the Coolidge case which I cited in the brief because, and why there was no exigency in Coolidge. First of all, there was no inconvenience to the officers to secure that car. Based on the officer's testimony at the suppression hearing, one officer stayed with Mr. Graham, he was already handcuffed. There's some question about exactly when he was put in the back of the police car but certainly he was put in the back of the police car at some point after his arrest and he was secured by a single officer in handcuffs watching him for officer safety while Officer Louder went and searched the car. So there's no reason that instead of searching the car, Officer Louder couldn't have used those car keys, secured the car and then obtained a warrant to search it. Is that the test though? The thing that I've been seeing a lot of these cases since Rodriguez and I do understand the concerns about slow walking and indefinite detention but it can't be the case, well it can't be the test that in retrospect it could have been done differently. Well, I don't think it's just in retrospect, I think the idea... But that's what we're doing, we're looking at it, there are a lot of people and although no one, finally someone in the crowd fessed up to having called 911 but disowned it, but it's still a fluid context and we are having to bring to it a Monday morning, a Monday morning quarterbacking. Well, it could have been the case that one person could have done this and one person could have done that, but is that the test? It doesn't seem to me that it can be given the fluidity of a situation that is being confronted in real time. Well, I think that... Just objectively, the fact that it could have been done differently is not an analysis or construct that I find particularly helpful. I understand and I do understand that law enforcement is given certain leeway because they are in a fluid and potentially dangerous situation. Why should it objectively have been done differently I guess would be a formulation that I find a little more palatable. Well, I think, and I don't think that, or my intent was not in the brief to indicate that we should be looking back retroactively on this and deciding, well, they could have done this or they could have done that. That's the formulation. It could have been, and I'm not, I understand that that's your argument. I'm just saying that from my perspective, an objective assessment of the situation of why it should have been done differently is something that might provide useful guidance going forward. Well, I actually don't think that it's a retroactive second guessing of what the police did because when they testified at the suppression hearing, neither one of the officers ever said they were worried about the crowd. They said, oh, there's a gun and we need to secure it. I'm sorry, I'm referring specifically to the fact that you said while it was a fairly short period of time, it was about six minutes, and while the officers were doing something with the keys, they could have been doing something else. That was what I was referring to. Well, I only refer to the keys because in my mind, since there is this requirement that it be not feasible that you get a warrant. I mean, if someone, if he, if Mr. Graham had a couple passengers in his car, if the crowd had come and surrounded the car when he was, when the officers were questioning Mr. Graham, that would make it more reasonable that the officers felt like they had to act immediately. None of the testimony showed that these officers were worried about the crowd. There was no indication that anyone knew the gun was in the car or would make a move toward the car. And so I say that they had the opportunity to secure it because I think that's the only reason it would be feasible to obtain a warrant. If you could secure this weapon, if this exigency is based on the safety of the public and officers. I think probably, Counsel, you're suggesting these counterfactuals, but the real essence of your argument is that given the circumstance that warrantless searches and seizures are presumed to be wrong, the point is there's nothing in the record that would otherwise suggest that they shouldn't have gotten a warrant. Period. Right? And that's your argument? Because in other words, you're starting to get into best practice in what they could have done is the absence of anything that would suggest, that would overcome the presumption that it's unconstitutional. That's correct, Your Honor. And as I cite the Gooch case, which is a Ninth Circuit case, and they have a great quote from the Ninth Circuit, that the presence of a firearm alone is not an exigency. And basically, the officers at the suppression hearing testified to nothing except the fact, oh, he had a gun, we had to go secure it for the safety of us and the public. But there was nothing else that showed there was a danger to the police officers given that Mr. Graham, the only person in the car, was handcuffed and in the back of a police car. And given that, the crowd was of no concern whatsoever to the police because even though they made, someone there made a 911 call, it only took them a few minutes to dispel with any concern with that crowd. Were people, was the crowd still intact? Were there people still mulling around? There were people up in the yard. And he was on, the car was on the street. Right. But I mean, the crowd had been in the yard. They were there and in the yard. And he was still there. Right. But even during the testimony, the officers never articulated that they had concern with that crowd. That was never a reason given at the suppression hearing as to why they believed this exigency existed. I want to make sure that I'm right about the record. There are four ways to get around that warrant requirement. You argued the exigency circumstance. I take it the government did not argue community caretaker or inevitable discovery. Am I right about that? They did not. And then the judge ruled with you on the automobile. The automobile exception, the district court agreed that because of the testimony of the officer that he didn't know at the time that the gun was retrieved from the car, that Mr. Graham had a prior felony conviction, that he couldn't, there was no probable cause to believe that gun was contraband. So I think that the court declined to decide whether it was a search, a valid search incident to arrest, although I think that's the weakest of the government's argument, that because Mr. Graham was secured and if not put in the back of the police car at the time, he was certainly handcuffed and on his way to the back of the police car at the time the search was conducted. And the only other alternative for the search incident to arrest is if it was reasonable to believe that there would be evidence of the crime of arrest found in that car and as the record shows, what Mr. Graham was ultimately arrested for was a warrant that was two years old for destruction of property. So there's no legitimate argument that there would be crime, there would be evidence of a two-year-old crime in his car at that time. So that is, those are the two other exceptions that I addressed in the brief. I did not address the inevitable discovery and the other, the community circumstance that you discussed because those were not raised at the district court. Much of the exigency case law as well, which I think is an important point, is that it has to do with the car's mobility. And I think in the Gooch case and the Coolidge case distinguish when a car is actually on the open road and when it's parked in someone's residence. So that makes a difference. And I think that it's also a question of when an exigency exists, if it's likely for the car to be moved or for someone to access it or whether it's not. And I think all of those factors would weigh in Mr. Graham's favor. But in sum, I would say it's hard to imagine under what circumstances that a warrant would be required to search a car, especially when a gun is found, if it's not practical in these circumstances for the officers to obtain a warrant. The rule would become that an assertion by the officer that he or his or the public was in danger and there's a gun involved and it's in this car, that it would just become the rule that the warrant isn't required in these circumstances. I believe I've addressed everything that I have prepared. Unless there are questions, I'll concede the rest of my time, which is only 34 seconds. Thank you, Counsel. Thank you. Mr. Walker. Garner. Thank you, Your Honors. Good morning and may it please the Court, Ben Garner on behalf of the United States. The warrantless search and subsequent seizure of the firearm in this case was justified by two exceptions to the warrant requirement, the exigency circumstances exception as well as the automobile exception, both of which provided the officers in this case independent grounds upon which to conduct a limited search of Mr. Graham's vehicle for the purpose of he had underneath the driver's seat of his vehicle. With respect to exigency circumstances or exigent circumstances, specifically within the firearm context, courts have held that a warrantless search and subsequent seizure of a gun is objectively reasonable under the Fourth Circuit when there is a real concern for the safety of the officers present or the public at large. Courts have further distilled that requirement to suggest that law enforcement officers have a right to secure firearms that are unintended and pose a risk that the public will find the weapon. And that's precisely what we had here. Based upon the elicited testimony from both Officers Deputy Reed as well as Deputy Louder, you had a circumstance where you had two factions of people, they'd been dispatched to the scene and based upon a 9-1-1 hang-up call whereby the operator informed Officer Reed that it sounded like there were disorderly individuals in the background. The factions were still intact. One faction was in close proximity to the vehicle that Mr. Graham was in and that was subsequently searched. And another faction was in close proximity to the residence. I think the proper word is that one crowd was closer to the car and the other wasn't, right? We don't know how far it was from there. None of the records say how far it was, but it was closer than the other. You're right, Judge Kroger. I think the testimony during the hearing was certainly that the vehicle was parked in the middle of the street close to the house where the officers were dispatched. One of the groups, one of the factions of individuals was closer to the street. The other faction was closer to the house. And I think an important point is the fact that Deputy Louder, who's the individual who conducted the search, he testified unequivocally during the suppression hearing that the reason that he was motivated to conduct this search is because he has a duty to act and make sure that it's in his possession and safety somewhere so that it doesn't cause any future problems or risk anything escalating the situation. That's precisely what courts have held to be the standard in order to authorize officers to perform a warrantless search when there's reason to believe that a firearm is in a vehicle. Well, if I told you, Mr. Gardner, that I have a gun outside my car, could you go out there right now and seize it if you were a law enforcement officer? Judge, the government certainly concedes the point made by the appellant and the point that numerous courts have recognized that mere possession alone does not establish exigent circumstances. Here, the officer had much more than that. And I do disagree with the appellant's characterization that the officers had no concern that any fear about the crowd had subsided at that point. Officer Reed's testimony was immediately upon arriving at the scene, he made contact with Mr. Graham. He observed the open containers in Mr. Graham's vehicle, got the license, did the warrant check on Mr. Graham, then went to address the issue with the two different groups. No, he didn't. He didn't go to address the issue with the two. He went to find out what was the nature of the call. Correct. That's different. As far as this record shows, they were out there talking to each other in two separate groups. There's no situation unless you call people staying in a situation. Judge Brewer, what you do have is the 911 dispatch report. It's a hang-up call. I'm sorry? It was a hang-up call. But the dispatcher did inform Deputy Reed that it was her impression that there was some disorderly conduct that she could discern from the background. It could have been television. You know my point? It could have been the television on in the background. Judge Brewer, even Officer Reed, who made contact with that individual who later admitted that she called 911, did recognize that there was a disturbance, but suggested that the disturbance was over. Officer Reed's testimony at that point was that he returned back to his vehicle, he sat in his vehicle and told Deputy Lauder to come as fast as soon as possible in light of the number of people that were at the scene. So the suggestion that any concern about the two different groups had subsided is inconsistent with the record, certainly inconsistent with Judge Harwell's specific finding that the officers were still in the process of securing the scene. That's why obtaining a search warrant in this case wasn't feasible. And then it goes to Judge Ogun's point regarding analyzing these Fourth Amendment issues with the benefit of hindsight, is the fact that what's undisputed here is you had two officers who were responding to a 911 hang-up call. They had information that there was possibly disorderly conduct in the background, and that those two officers were outnumbered by the number of individuals who were at the scene. This case falls comfortably within the number of cases that are cited by the district court in footnote 10 of its opinion, whereby courts have said that exigent circumstances are warranted. And I would point out that in this case the concern is much more concrete. We have other cases, the Seventh Circus decision in Webb, where there's a more abstract concern. The firearms were actually in the trunk of the vehicle. It was the location, the public location, that gave the officers the exigent circumstances. There wasn't a crowd in close proximity like we had here. And so I submit that here is much more persuasive in light of the groups of individuals in close proximity to the car. Is there anything in this record that would even tell you that the crowd knew he encountered Mr. Graham? There's nothing. Correct, Your Honor. Absolutely. You don't have anything that even knew he even encountered him. All right. I'm going to make sure that's clear. That's correct. I mean, other than the inferences that he was parked immediately adjacent to the residence where individuals were at, that's the only evidence. There's no explicit testimony from any of the officers or anyone at the scene as to Mr. Graham, whether or not he was involved with the two groups or otherwise. But the, and I believe the district court's finding was that any number of the bystanders could have known about the possession of the firearm in that vehicle and could have retrieved it. How could they have known? Well, it was the inference that the district court made. That's not inference. That's speculation. How could they have known? Under this record, how could they have known? That has to be rank speculation. The only, I believe based upon looking at the testimony that was listed at trial, the only way they could have known is had, it would be based upon Mr. Graham's involvement with any one of the individuals who were at the scene. Like I said, there wasn't. Both involvement on this record. You're correct. There was no testimony elicited. Would you agree that would have to be speculation to conclude that? I do agree that there's a degree of speculation. Then you have proximity. And then that's the point I'm trying to make. There is an inference, a reasonable inference. Under this record, how far was the vehicle from the house? There's no testimony regarding foot, yards. The testimony is that it was parked. There's none. The testimony is that, from Officer Reed, is that he responded to the location that the 911 dispatcher told him to go to. Immediately upon driving to that location in the street in front of that residence was Mr. Graham's car. Could I ask, it was parked in the middle of the roadway, right? It was parked in the roadway. It was parked in the lane closest to the residence. What I'm asking is, it wasn't an obstruction? That was what I was getting to. It wasn't parked on the curb. It was parked in a lane? Correct. Deputy Reed's testimony was unequivocal in that point. Insofar as that the vehicle was illegally parked in the driving lane in front of that residence. It wasn't actually in the middle of the road, but it was impeding the road and, therefore, illegally parked. That's why Officer Reed indicated that he could have arrested Mr. Graham for that infraction, as well as the open containers that were seen in plain view. What happens to that car when Graham is placed in the police car? Judge Duncan, once again, below there was no testimony elicited. You have a vehicle illegally parked in the middle of a lane. Right. And the driver is in the police car. Correct. I will say, after the testimony was elicited from both of the officers, the prosecutor below indicated, represented to the district court, that the vehicle was not impounded. That's the only information that's in the record. I suspect it was somehow moved to the side of the street, but the only information in the record is the representation from the prosecutor below that the vehicle was not actually impounded. So, based upon the information that was elicited from the officers below, based upon the district court's findings of accidental circumstances, the fact that the officers were still in the process of securing the scene, that it was a nighttime, that the 911 dispatcher had reported disorderly conduct in the background, multiple bystanders in close proximity to the car, that the officers were, and this is their own testimony, actively attempting to preserve the status quo of the circumstances, it's the government's position that the executive circumstances. See, maybe if that was the facts, as you said, it may be a different case. But there's no evidence in this record that they were bystanders. That's intellectually not true. There's no evidence that they were bystanders. The evidence is that they were at a home. One group was here. A bystander is different. A bystander is somebody focused on what the police officer is doing. They're bystanding. That's different. That's not this case. It's like saying you can go and any time you go to a party to someone's home, they could have been sitting on the yard croquet or whatever they're doing with, you know, white sneakers on and, you know, Dockers and whatever, and say, well, you know, they're all there playing croquet, so I need to go get that gun. But there's no evidence that they had anything to do. There's nothing about this crowd at all, and there's nothing about that would indicate they were anything other than the fact that somebody said it's unequivocal, undisputed, there was some question, but it's now gone and there's no need for you. And the police officer was satisfied with that. So satisfied that with all those people around him, he quickly went back to a traffic stop. Right? Am I correct? With all due respect, I do disagree with certain portions of that. Like I said. What part do you disagree? Do you think they are bystanders? There's no evidence they were bystanders. I think you have to look at the lens of what the officers were actually going through. Looking through the lens of the record. But it's not as if the judicial court found that the officers were still in the process of securing the scene at the time the officer allowed. The judicial court can't find reasonably what the record doesn't have. We don't have to defer to what's not in the record. The record is that there were people there. And there were people there. And he left. And he left that situation. And he was satisfied with the call finished, the 9-1-1 call. Correct? I don't believe that's right. I would draw the court's attention to page 49 of the joint appendix. That's when Officer Reed testifies that after obtaining the license, the driver's license from Mr. Graham, he went to the two different groups of individuals. And then as soon as he made contact with the person who called 9-1-1, he immediately returned to his vehicle, quote, for safety reasons and told Deputy Laudry to come as soon as possible in light of the number of people. So I don't think it's a fair, I think the district court correctly determined. Having backup is not unusual for a police officer in a night stop. Right. How many times have you seen people stop for speeding on a highway and you have two or three cars there? District Court, I raise that just to point out the fact that I don't think it's fair to say that the investigation as it pertains to the 9-1-1 call was necessarily complete. When the individual who called 9-1-1 said the disturbance is over, he returned to his vehicle and said, come as fast as you can. Deputy Laudry had already been dispatched to the scene, but he wanted to wait for Officer Laudry to conduct any further investigations. In that web case that you referred to a while ago, there were individuals in the crowd or group that knew about the gun. Here, there's no evidence that anybody in that crowd knew anything about a gun. I believe, Judge Floyd, with respect to the web case, there was testimony or information suggesting that they knew that the defendant had been firing a weapon. In web, the weapon was actually in the trunk of the vehicle. I don't believe there was any information suggesting that other individuals knew that there was a firearm in the trunk of the vehicle. So I don't think web supports the proposition that, with respect to exigent circumstances, it's specifically tied to some sort of concrete knowledge of other individuals knowing the firearm. And that goes back to a point raised by Judge Duncan to appellate's counsel, is that this was two officers who were outnumbered by virtue of the individuals who were at the scene. They were making quick decisions. There's no evidence of any quick decision here. That is, like, totally different in this record. What in the record says he was making a split decision about anything? Can counsel try to get the first shot at it? What in this record said he was making a split decision about anything? Answer that question. I think Deputy Lauder's testimony alone clearly infers and certainly suggests the fact that they were making a fast decision. The fact that he has a duty to act and make sure that the firearm is in their possession and safely somewhere so that it doesn't cause any future problems or risk calculating. That was a split decision? That was a split decision. Well, it would certainly be inconsistent. If he's concerned about public safety. A split decision, he could have walked up there. That's what I think counsel was talking about, locked the door. What's the split decision? But, I mean, at some point I think it's important to recognize is that you had two officers who were outnumbered. What do you mean outnumbered? That's another thing. What do you mean outnumbered? Because they responded. Well, two officers walked down the street right here on Main Street. They outnumbered every day. If you talk about civilian versus police officers. Judge Kruger, I think you have to view it through the lens of. I am viewing it through the lens. You said he was outnumbered. That is characterization of this situation is totally different. I don't believe it. For example, okay, you want to be analytical about it. You walk down the street, two officers, and civilians are walking up and down. Are they outnumbered? Yes. So then every encounter with one person, you had de facto exigency because they're outnumbered on the street. No, Judge Kruger. What then puts that crowd of people in this situation, this stop, other than the fact that there are numbers of people more than police officers present? Because you have a specific 911 call tied to this location based upon any disturbance. Officer Reed actually obtained confirmation from the individual calling 911 that there had been a disturbance between at least individuals at that location. And at that time, Officer Reed's testimony is that he directed to be allowed to come as soon as possible because he was in fear for his safety. That's his statement on page 49 of the Joint Appendix. Well, police officers might be fearful of safety all the time. I would if I was a police officer. But that doesn't mean that gives you the Fourth Amendment, goes out the window because you fear for your safety when there are no facts here to suggest that anybody was doing anything at that time to jeopardize your safety. A police officer may be fearful all the time. That's why they have guns. Well, and certainly the exigent circumstances exception to the search warrant requirement allows specifically in the firearm context officers to conduct a warrantless search if they're concerned about either their own safety or the safety of others. Deputy Louder's testimony below was that he was concerned about safety. That was his justification and motivation for going into the vehicle. Judge Harwell found that testimony to be credible. And it's, at this point, viewed in the light of the government in light of the fact that the government prevailed below. If I may quickly address the other exception by which the government advances in its appeal that would justify the warrantless search, and that is the automobile exception. As Deputy Reed testified below, immediately upon making contact with Mr. Graham, he shone the flashlight into the vehicle. He saw and observed two open containers in the vehicle, and he testified that that could serve as a justification to arrest Mr. Graham. The automobile exception has two requirements. First, that the car be readily mobile. Second, that there's probable cause to believe it contains contraband of any crime. Unlike the search incident to lawful arrest, the automobile exception is broader, so it's the government's position that based upon observing the two open containers, that the officers would be authorized, pursuant to the automobile exception, to conduct a search of the vehicle, and that would supply an independent basis for which I thought the court ruled against the government on the automobile exception. And, Judge Boyd, that's a good point, and footnote. You appealed that, didn't you? I'm sorry? You appealed that decision? We did not. In actual, the court can affirm on any basis that they're in the record. I just want to point out the fact that Judge Harwell, when articulating the rule for the automobile exception, articulated the rule correctly, and that is that if the officers have probable cause to believe that there's evidence or contraband of any crime, then it would authorize a search. However, when applying the rule, Judge Harwell focused on the fact that Officer Reed's testimony was inconsistent with respect to whether or not Officer Reed knew the defendant was a felon prior to the defendant's arrest. That's the rule for search and instance law for arrest. That's not the rule for the automobile exception. So, it's the government's position that that would serve as an alternative basis for which the court to affirm the district court's denial of the suppression hearing below. If there are no further questions, we ask that you affirm that decision. Thank you so much, Mr. Gardner. Ms. Albro. Thank you, Your Honor. I just want to address a few points raised by the government. First of all, the government quoted some testimony from Mr. Louder, from Officer Louder, about that he feared for his safety because of the present. But basically, the quote from Deputy Louder amounts to nothing more than him saying the reason he feared for his safety and the public's safety was because of the presence of a gun. There was nothing else mentioned. No other facts supported this exigency that he described on the stand. Does that mean we can't consider it? I'm legitimately asking. I'm not being argumentative. The court is allowed to consider any facts in the record to support a decision. And I would say that if it's something like the inevitable discovery, which hasn't been raised, there is a case, which I'm sorry I cannot remember the name of it, that usually says send it back to the district court if it hasn't been addressed at all. But you can consider the facts. I guess I'm trying to distinguish these facts because the quote on page 49, where the government is saying that this shows the ongoing concern with the crowd, I don't think it shows that at all because I would like to read the quote. What Deputy Reed said was, I waited for Deputy Louder for safety reasons. And this was after he had approached the crowd. It was within a minute when I got that information that he was on scene, went over there and got Mr. Graham out of the vehicle and went ahead and detained him, waiting on confirmation from Myrtle Beach for the warrant. So that quote that the government relied so heavily on shows that Deputy Reed's concern for safety had nothing to do with the crowd. It had to do with Mr. Graham. That was his only concern. And it seems to me, I think Judge Gregory adequately addressed this, but I just wanted to say, it seems to me that this entire time that the officers were on the stand at the suppression hearing, testifying about what justified them making this warrantless search to get the gun out of the car, if they were concerned about this crowd, they would have testified about it. Something would have come up about this concern about the crowd. And I think that's assuming things that the officers didn't testify to. This was not their state of mind at the time they were retrieving this gun. It wasn't their state of mind because they showed no concern whatsoever about these people. I mean, they were even ---- They certainly didn't articulate. I'm sorry, I didn't hear you. We're going to stay with the record. Your assertion is they didn't articulate any concern. They didn't articulate it, and it seems to me that that gives the whole surrounding settings for whether or not there was exigency. Whether or not the officers were concerned with the people at the time, and that's why they conducted this warrantless search, they would have gone ahead and done that. And the one last thing I wanted to say, and Judge Floyd asked about the Webb case, unless I completely misquoted it in my brief, which I don't believe I did, that case is absolutely distinguishable from this case because there was a man in a tavern parking lot pointing a gun at people. He ran and put that gun in the trunk of his car and left the keys in the trunk of the car. So, therefore, there was a crowd out in the parking lot. Anyone could have gone up, used those keys to open the trunk and get the gun out. I believe I was on that panel. You were on that panel? I believe so. That is, and I hope that I did not misquote that in my brief, but I believe those were the facts of that case, and that is how I distinguished it, and that is one of the things that made me think of the keys in this case and how it's distinguishable because the car could have been secured so that a warrant could have been accepted. After all, that is the rule that a search should be conducted with a warrant when at all possible. Thank you. All right. Thank you, counsel. We'll come down, greet counsel, and proceed to our last case of the term.
judges: Roger L. Gregory, Allyson K. Duncan, Henry F. Floyd